IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DERRICK JAMES HERRING,           )
                                 )
          Plaintiff-Claimant,    )
                                 )        No. 11 C 6508
     vs.                         )
                                 )        Jeffrey T. Gilbert
MICAHEL J. ASTRUE, Commissioner  )        Magistrate Judge
Of Social Security,              )
                                 )
          Defendant-Respondent.  )

## MEMORANDUM OPINION AND ORDER

Claimant Derrick James Herring ("Claimant") brings this action under 42 U.S.C.

§ 405(g) seeking reversal or remand of the decision by Respondent Michael J. Astrue,

Commissioner of Social Security ("Commissioner"), in which the Commissioner denied

Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"). This matter is before the Court on the parties' cross motions

for summary judgment. [Dkt.##15; 17.] Claimant argues that the Commissioner's

decision denying his application for SSI and DIB should be reversed and/or that the case

should be remanded for further proceedings. Claimant raises the following issues in

support of his motion: (1) whether the Administrative Law Judge ("ALJ") erred by

failing to account for Claimant's daytime somnolence[1] in assessing his residual

functional capacity ("RFC"), and (2) whether the ALJ failed to fully develop the record

with regard to Claimant's mental impairments as they relate to Claimant's daytime

somnolence. The Commissioner acknowledges the issues raised by Claimant but argues

the ALJ's decision is correct and should be affirmed. For the reasons set forth below,

---

[1] "Somnolence" refers to the quality or state of being drowsy. *Mirriam-Webster*, w-m.com,
http://www.merriam-webster.com/medical/somnolence.

Claimant's motion for summary reversal [Dkt. #15] is granted, and the Commissioner's motion [Dkt. #17] is denied.

## I. BACKGROUND

### A. Procedural History

Claimant filed an application for DIB and SSI on December 4, 2007,[2] alleging an initial onset date of August 17, 2007. R.136; 139. Claimant's date last insured is December 31, 2012. R.10. The Social Security Administration ("SSA") initially denied his application on March 18, 2008, and again denied his claim upon reconsideration on June 10, 2008. R.74-77; R.80-84. On June 20, 2008 Claimant filed a written request for a hearing before an ALJ. R.88. Claimant appeared with counsel and testified at a hearing before an ALJ on October 13, 2009. R.28. Vocational Expert ("VE") Thomas A. Grzesik and Medical Expert ("ME") James M. McKenna, M.D. also appeared and testified at the hearing. R.27-28.

On May 18, 2010, the ALJ rendered a decision finding Claimant was not disabled under the Social Security Act. R.14. Specifically, the ALJ determined that Claimant "has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except the claimant cannot climb ladders, ropes and scaffolds, only occasionally climb ramps and stairs, balance, stop, kneel, crouch, and crawl. The claimant should avoid heights and moving machinery, and avoid concentrated exposure to dust and fumes. The claimant should not drive commercial vehicles. The claimant can only occasionally feel with the bilateral hands." R.14.

---

[2] Claimant's application is dated December 11, 2007. The ALJ's decision and Claimant's motion refer to the application date as December 4, 2007. The difference does not appear to be material to our analysis.

Claimant filed a request for review of the ALJ's decision. The Appeals Council denied his request on August 12, 2011, making the ALJ's decision the final decision of the Commissioner. R.1. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

### B. Hearing Testimony

#### 1. Derrick James Herring – Claimant

At the time of the hearing, Claimant was 42 years old, living with his mother and sister. R.28-29. Claimant has high blood pressure, diabetes, and sleep apnea. R.30. Claimant has a high school education with some college. R.236. He worked as an engineering technician for the City of Joliet for eighteen years. R.233. Claimant was terminated from his job on August 17, 2007 and has not worked since. R.30. After losing his job, Claimant was unsuccessful in his attempt to obtain unemployment compensation. R.30-30.

At the hearing, Claimant testified he has diabetes and his blood sugar is not in control. R.31. He explained that the diabetes causes blurry vision, fatigue, and occasional loss of strength and tingling in his arms and wrists. R.32. Claimant testified that his blurred vision affects his ability to read a newspaper. R.32. Claimant explained that he tries to help around the house, but mostly sleeps. R.32. He stated that the pain in his arms and wrists sometimes renders him unable to pour milk and also affects his ability to complete household chores like mowing the lawn. R.32. Claimant testified he has to take breaks while doing those chores. R.32-33. He also testified that he experiences back pain for which he takes medication. R.33. Sometimes the pain is so severe that he needs help getting up. R.33.

Claimant testified he experiences aching pain in his legs from his hips to his knees. R.33. He stated that he could stand for half an hour before needing to sit down. R.33-34. Claimant testified he is able to walk a few blocks. R.34.

Claimant stated that he has sleep apnea and uses a CPAP (Continuous Positive Airway Pressure) machine. He testified he is unable to sleep laying flat because of the mask, so he usually sleeps in a recliner. R.34. Claimant stated that he sleeps for approximately five hours per night with the CPAP machine. R.34. Claimant testified that he uses the CPAP machine five to six days out of the week. R.41. He testified he suffers from fatigue and takes three or four short naps daily, but never feels as though he gets enough rest. R.32, 34-35. Claimant also stated that he sometimes wears the CPAP mask during daytime naps. R.34. Claimant reported that he experiences mood swings, always feels angry, and fears that he cannot provide for himself. R.35.

Claimant reported that he tries to do some household chores some days. R.36. Claimant testified that he does his laundry, mops, vacuums, and occasionally cooks. R.37. When he does have the energy to do so, however, he has to take several rest breaks. R.36. Claimant drives three times per week. R.37. He also testified that he has friends and attends church once a month. R.37. Claimant stated that he is "usually at home, that's about it." R.37.

Claimant experienced kidney failure while he was still employed. R.35. He testified he went to the emergency room and was hospitalized for kidney failure but has not sought subsequent treatment for that issue. R.35-36. Claimant takes medication for diabetes, blood pressure, back pain, and restless leg syndrome, and he takes them most of the time. R.38; 40. He reported experiencing side effects of fatigue and sleepiness from

the medication.  R.38.  Claimant stated that the blood pressure medication also gives him migraine headaches.  R.38.  Claimant does not smoke or drink, and had not imbibed any alcohol for two months prior to the hearing.  R.38; 40.

In addition to his diabetes, sleep apnea, hypertension, and back pain, Claimant testified that he has a lumpy neck and his parotid glands bother him.  R.43-44.  He had not recently been retested for sarcoidosis and had not had an eye exam since February of 2008.  R.44.  At the time of the hearing, Claimant was 5'11" tall and weighed 220 pounds.  R.44.

### 2.  James M. McKenna -- Medical Expert ("ME")

At the hearing, the ME testified that Claimant was diagnosed with adult onset diabetes in March 2007.  R.44.  The ME explained that fluctuations in Claimant's vision could be due to fluctuations in Claimant's blood sugars, and that Claimant's diabetes is poorly controlled.  R.46-47.  The ME testified that Claimant does not have significant peripheral neuropathy.  R.46-47.  He noted that Claimant experienced one episode of acute renal failure and is back to normal in that respect.  R.47.  The ME expressed a lack of understanding of why Claimant's diabetes is uncontrolled in light of Claimant's diet, medications, and compliance with follow-up visits.  R.47.  He stated, "It doesn't tally very well."  R.47.

The ME testified that Claimant has obstructive sleep apnea and described Claimant as "fairly compliant" with the CPAP.  R.48.  He reported a "disconnect" between Claimant's reported compliance with the CPAP and Claimant's reported health status.  R.48.  The ME did not see anything about Claimant's back pain in his medical

records.  R.48-49.  He opined that Claimant could have pain and functional back problems from sleeping in a recliner.  R.49.

The ME calculated Claimant's body mass index ("BMI") to be 30—"barely ring[ing] the obesity bell."  R.49.  The ME stated again that Claimant's status and the available medical evidence didn't "gel."  R.50.  He suggested that a mental impairment such as depression could "fill the gap and explain why the performance standards are different from the physical standards."  R.50.

In response to questioning from the ALJ, the ME stated that, based on a sleep study, Claimant had "excessive hypersomnolence."  R.50.  According to the ME, uncontrolled sleep apnea causes feelings of being constantly tired and can engender secondary depression.  R.51.  The ME clarified that his testimony regarding sleep apnea and depression was just a suggestion and not the ME's area of expertise.  R.51.  The ME suggested the following work restrictions: avoid ropes, ladders, scaffolds, unprotected heights, concentrated exposure to moving machinery, and driving mechanical vehicles such as forklifts.  R.50.

Answering questions from Claimant's counsel, the ME testified that blurry vision and difficulty reading occur when blood sugar levels fluctuate, as opposed to when adult onset diabetes is either persistently controlled or uncontrolled.  R.55-56.  The ME also described sleep apnea and its effects.  R.56-59.  He testified sleep apnea causes people to "wake like a spent rag . . . . not fit for the fight."  R.59.  The ME testified that sleep apnea can exacerbate depression but not vice versa.  R.60.

### 3. Thomas Grzesik – Vocational Expert ("VE")

The VE described Claimant's past relevant work as a municipal engineer technician, which he categorized as light skilled work. R.62. While questioning the VE, the ALJ asked whether a 42-year-old individual with the same education and work experience as Claimant could perform his past relevant work if he had the following restrictions on his residual functional capacity to perform light work: he can lift and carry 20 lbs. frequently and 10 lbs. occasionally; he can stand and walk six hours in an eight hour day and sit two hours in an eight hour day; he cannot climb ropes, ladders, or scaffolds; he can occasionally climb ramps and stairs with occasional balancing, stopping, kneeling, crouching or crawling; he should avoid unprotected heights, dangerous moving machinery, concentrated exposure to dust and fumes, and cannot drive commercial vehicles. R.62. The VE testified that the hypothetical person could not perform Claimant's past work. R.62. The VE testified that the hypothetical person could perform light unskilled work. R.62. He stated that light unskilled jobs were available in the region, such as cashier (20,000 jobs in the region), sales attendant (32,000 jobs in the region), and office helper (6,000 jobs in the region). R.62-63.

The ALJ altered the hypothetical to add that the person would be limited to occasional feeling in his/her bilateral hands. R.63. The VE testified that the additional restriction would not have a significant effect on the available jobs because they are not "feeling sensitive." R.63.

The ALJ then changed the hypothetical from light work to sedentary work with the other limitations staying the same. R.63. The VE testified that the hypothetical person would not be able to perform Claimant's past relevant work or the jobs that the

VE described in response to the first hypothetical. R.63. The VE testified that the new hypothetical person could perform sedentary, unskilled jobs in the regional economy, such as callout operator (8,000 jobs in the region), information clerk (7,500 jobs in the region), and order clerk (1,000 jobs in the region). R.63-64.

In response to questioning from Claimant's attorney, the VE testified that for both light and sedentary work, taking naps and getting "real sleep" during the workday would not be permissible. R.66.

### C. Medical Evidence

### 1. Silver Cross Hospital

The emergency department at Silver Cross Hospital first diagnosed Claimant with diabetes on March 18, 2007. R.295. Claimant was admitted to the hospital again on August 27, 2007, complaining of chest pain. R.306. A chest x-ray and stress echocardiogram did not produce any remarkable results. R.326-27.

On November 10, 2007, Claimant was admitted to the hospital through the emergency room following an episode of syncope. R.337. Claimant had acute renal failure. R.337. The ultrasound of Claimant's kidney did not show any significant renal abnormalities. R.377. Similarly, a brain MRI was normal and a CT scan of Claimant's brain showed no evidence of acute intracranial process. R.378-379.

### 2. Dr. Manubolu & Dr. Pethkar – Claimant's Treating Physicians

Claimant began treatment to better control his diabetes on June 18, 2007. R.427. At his first visit with Dr. Manulobu, Claimant demonstrated a poor compliance with his medications, his blood glucose level was 306, and he complained of occasional blurred vision and weakness due to his medication. R.427-29. Claimant attended regular follow-

up appointments with Dr. Manulobu and Dr. Pethkar, and frequently complained of daytime somnolence. R.430; R.437; R.439; R.448; R.450. On July 9, 2007, Dr. Pethkar advised Claimant to be off work until he underwent a sleep study. R.451. At a follow-up appointment one week later, Claimant complained of daytime somnolence, lack of restful sleep at night, and headaches. R.450. Claimant denied experiencing any visual problems or tingling numbness in his arms or legs at that time. R.450. Because of Claimant's excessive somnolence, on August 3, 2007, Dr. Manubolu advised him to stop working with machines and to avoid driving. R.448.

On September 11, 2007, Claimant reported sleep disturbances and daytime somnolence. R.441. Dr. Pethkar noted Claimant had sleep apnea and recommended that he be off work until a sleep study was done. R.441. Dr. Pethkar found that Claimant's right parotid gland was swollen and that Claimant did not have any eyesight problems. R.441. Dr. Pethkar referred Claimant to ENT Surgical Consultants, Ltd., where Dr. Rajeev Mehta found that Claimant's left and right parotid glands were swollen. R.415.

Claimant saw Dr. Pethkar for a follow-up appointment on November 7, 2007. R.437. Claimant complained of sleep dysfunction, daytime somnolence, and tingling numbness in his legs. R.437. Dr. Pethkar noted that Claimant had decreased sensitivity in his legs and arms and assessed him to have neuropathy. R.437-38. No apparent diabetic retinopathy was found in either of Claimant's eyes on that date. R.396. Claimant's left eye did show sub-optimal image quality. R.396. Dr. Pethkar signed the certificate of medical necessity for Claimant's CPAP machine on November 9, 2007 and estimated that he would need it for the rest of his life. R.394. A nerve conduction study

performed on November 15, 2007 showed that Claimant did not meet the minimal nerve conduction criteria for diabetic polyneuropathy.  R.388.

On December 17, 2007, Claimant complained of chronic fatigue and multiple joint pains.  R.432.  One month later, Claimant complained of sleep dysfunction with daytime somnolence.  R.430.  Dr. Pethkar noted that Claimant had decreased sensitivity in his arms and legs and diagnosed Claimant with neuropathy.  R.430-31.

Dr. Pethkar noted that Claimant was compliant with his medications and diet at various follow-up visits on July 9, 2007, August 22, 2007, November 21, 2007, and December 17, 2007.  R.451; R.446; R.435; R.432.

Dr. Pethkar completed a questionnaire about Claimant's residual functional capacity on January 2, 2009.  R.547.  Dr. Pethkar stated that Claimant has been diagnosed with diabetes, sleep apnea, and neuropathy.  R.549.  Dr. Pethkar opined that Claimant cannot use his hands for long periods of time because he has severe neuropathy.  R.550. Dr. Pethkar further stated that Claimant cannot travel alone or work at heights due to his sleep apnea.  R.550.

### 3.  Dr. Robert Aronson – Sleep Study Reviewing Physician

From October 1, 2007 to October 2, 2007 Claimant underwent a sleep study (polysomnography) at Cardinal Sleep Disorder Centers of America at Silver Cross Hospital in Joliet, Illinois.  R.540-42.  Dr. Aronson reviewed the results of Claimant's sleep study and made recommendations.  R.542.  Claimant had complained of hypersomnia, waking once per night, sleeping until 3 p.m. on weekends without response to increased time in bed, and loud snoring.  R.540.  Claimant admitted prior use of

recreational drugs and reported nasal congestion, hypertension, diabetes, and worrying, crying, and feeling sad.  R.540.

Dr. Aronson found obstructive sleep apnea, globally moderate; severe supine and overall mild on Claimant's side but moderate on Claimant's side during REM.  R.541.  Dr. Aronson noted that Claimant had hypersomnia and sleep maintenance insomnia due in large part to his obstructive sleep apnea, but also noted that any contribution from any affective disorder or drug use would need clinical correlation.  R.541.  Dr. Aronson further noted that Claimant had hypertension (potentially due to his obstructive sleep apnea) and possible depression.  R.541.  Dr. Aronson recommended therapeutic polysomnography to assess nasal CPAP, an upper airway exam, weight loss, cessation of recreational drug use, and that Claimant avoid situations requiring vigilance until his symptoms were resolved on therapy.  R541.

### 4. State Agency Reviewing Physicians

On February 26, 2008, Dr. Helena M. Radomska, a consultative examiner, performed a psychiatric evaluation of Claimant for the Bureau of Disability Determination Services.  R.459-63.  Dr. Radomska concluded that Claimant is not capable of handling funds in his own interest if benefits are granted.  R.462.  Dr. Radomska diagnosed Claimant with "major depressive disorder, moderate to severe, partially treated on the current regimen" and evaluated his GAF score to be 45.  R.462.  Dr. Radomska noted that Claimant had anger problems but was not psychotic or suicidal.  R.462.  Finally, Dr. Radomska reported that Claimant's sleep apnea might complicate his mood symptoms.  R.462.

On the same date, Dr. Steven C. Eidt performed a consultative ophthalmology examination of Claimant on behalf of the Bureau of Disability Determination Services. R.466-68. Dr. Eidt found that Claimant was experiencing fluctuation in his lens caused by uncontrolled diabetes. R.466. Dr. Eidt reported that Claimant otherwise had a relatively normal ocular examination. R.466. Dr. Eidt opined that Claimant would benefit from eyeglasses once good blood sugar control allowed Claimant's lens to stop fluctuating. R.466.

Dr. Michael J. Schneider performed a psychiatric review of Claimant on March 13, 2008. R.469. He concluded that Claimant had a "not severe" affective disorder. R.469. Specifically, Dr. Schneider found Claimant to have a depressive syndrome. R.472. Claimant had a "mild" limitation on activities of daily living, social functioning, and maintenance of concentration, persistence, or pace, and had not experienced any episodes of decompensation. R.479. Dr. Schneider's review of the evidence led to his conclusion that Claimant's history did not establish the presence of the "C" criteria of the listings.[3] R.480. Claimant has not undergone any psychiatric treatment. R.481. Dr. Schneider concluded that Claimant's depression was likely caused by his unemployment and medical conditions, and that his mental impairment status is not severe and does not prevent him from engaging in substantial gainful activity ("SGA"). R.481.

Dr. Frank Jimenez completed a Physical Residual Functional Capacity Assessment form on March 14, 2008. R.483-90. Dr. Jimenez found Claimant's

---

[3] The "C" Criteria refer to a severe mental impairment. Specifically, they refer to a medically documented history of chronic organic mental, schizophrenic, or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms attenuated by medication or psychosocial support, and repeated episodes of decompensation, a residual disease process that indicates a likelihood to decompensate easily, or a current history of at least one year's inability to function outside of a highly supportive living arrangement. See R.480; Form SSA-2506-BK (06-2001).

allegations credible given the severe nature of his sleep apnea.  R.484; 490.  Dr. Jimenez

characterized Claimant's neuropathy as "in [the] beginning stages[,] affecting bilateral

arms and legs with decreased sensation."  R.490.

### D.  The ALJ's Decision – May 18, 2010

After a hearing and a review of the medical evidence, the ALJ determined that

Claimant was not disabled from his alleged onset date of August 17, 2007, upholding the

denial of Claimant's application for disability insurance benefits.  R.20.  The ALJ

evaluated Claimant's application under the appropriate five-step analysis.  R.11-19.  At

step one, the ALJ found Claimant had not engaged in SGA since August 17, 2007, the

alleged onset date.  R.12.

At step two, the ALJ found Claimant has the following severe impairments:

diabetes mellitus, sleep apnea, hypertension, low back pain, and minimal obesity.  R.12.

The ALJ found that Claimant's mental impairment of depression is nonsevere because it

does not cause more than minimal limitation on his ability to perform basic mental work

activities.  R.12.  The ALJ acknowledged that Claimant's Global Assessment of

Functioning ("GAF") score of 45 is indicative of serious symptoms, but noted that

Claimant has not received any treatment from a mental health professional.  R.13.

Additionally, the ALJ noted a lack of evidence that Claimant experienced serious

symptoms for a period of 12 months as required by Social Security rulings and

regulations.  R.13.  In arriving at the conclusion that Claimant's mental impairment is

nonsevere, the ALJ considered the "Paragraph B" criteria, which include four broad

functional areas used to evaluate mental disorders pursuant to 20 C.F.R. Part 404,

Subpart P, Appendix 1.  R.13.  The ALJ found Claimant to have mild limitation in

activities of daily living, social functioning, and concentration, persistence or pace.  R.13.
In the fourth functional area, Claimant has not experienced any episodes of
decompensation.  R.13-14.  The ALJ indicated that her residual functional assessment
reflected the "Paragraph B" limitations she found.  R.14.

At step three, the ALJ found that Claimant does not have an impairment or
combination of impairments that meets or medically equals one of the listed impairments
in 20 C.F.R. 404.1520(d); 404.1525; 404.1526; 416.920(d); 416.925; and 416.926.  R.14.
The ALJ proceeded to consider Claimant's RFC and found Claimant capable of
performing light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except:
"Claimant cannot climb ladders, ropes and scaffolds, only occasionally climb ramps and
stairs, balance, stoop, kneel, crouch, and crawl.  The claimant should avoid heights and
moving machinery, and avoid concentrated exposure to dust and fumes.  The claimant
should not drive commercial vehicles.  The claimant can only occasionally feel with the
bilateral hands."  R.14.

The ALJ found that Claimant's medically determinable impairments could
reasonably be expected to cause the alleged symptoms, but that his statements regarding
"the intensity, persistence, and limiting effects of these symptoms are not credible to the
extent that they are inconsistent with the above residual functional capacity assessment."
R.15.  The ALJ wrote that Claimant's diabetes did not "meet or medically equal a listing
because he does not have neuropathy, acidosis, or retinitis proliferans."  R.14.  The ALJ
noted that the ME testified that Claimant did not have diabetic neuropathy or end organ
damage.  R.17.  The ALJ did find Claimant to have other severe impairments, including
minimal obesity.  R.16.  The ALJ considered Claimant's obesity in terms of its effect on

his other impairments, including the sleep apnea.  R.16.  To account for Claimant's obesity, the ALJ limited his postural limitations.  R.16.

In assessing Claimant's credibility under SSR 96-7p, the ALJ took note of Claimant's alleged limitations in activities of daily living, but found that he continued to engage in a variety of daily activities including chores and driving.  R.16-17.  The ALJ took note of the ME's testimony regarding the possibility that depression could explain the "disconnect" between Claimant's allegations and the evidence of record.  R.17.  However, the ALJ found depression to be a nonsevere impairment.  R.17.  The ALJ decided that a second psychological consultative examination was not necessary because Claimant had received "little treatment for depression" and "he performed tasks well on examination."  R.17.   The ALJ concluded, Claimant "is able to engage in sustained gainful activity despite his allegations of daytime somnolence."  R.17.

In weighing the evidence, the ALJ stated that she gave "great weight" to the opinion of the ME and "little weight" to the opinion of Claimant's treating physician, Dr. Pethkar.  R.17-18.  The ALJ found Dr. Pethkar's opinions to be conclusory, very limiting, and inconsistent with the evidence of record as well as the ME's opinion.  R.18.  Specifically, the ALJ found a discrepancy between Dr. Pethkar's statement that Claimant had severe neuropathy and objective testing that showed Claimant did not meet minimal nerve criteria for a diagnosis of diabetic polyneuropathy.  R.18.  Finally, the ALJ concluded, "[t]o the extent the claimant alleges greater limitations, his testimony is not fully credible."  R.18.

At step four, the ALJ determined that Claimant cannot perform his past relevant work as an engineering technician.  R.18.  At step five, the ALJ considered Claimant's

age, education, work experience, and residual functional capacity and determined that there are jobs that exist in the national economy that Claimant can perform. R.19. Therefore, the ALJ found that Claimant is not disabled under the Social Security Act. R.19.

## II. LEGAL STANDARD

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2002).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support those findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in

the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

Claimant raises the following issues in support of his motion: (1) whether the ALJ erred by failing to account for Claimant's daytime somnolence in assessing his RFC, and (2) whether the ALJ failed to fully develop the record regarding Claimant's mental impairments as they relate to Claimant's daytime somnolence.

#### A. The ALJ Failed To Explain How She Accounted for Claimant's Daytime Somnolence In Assessing His RFC

Whether the ALJ failed to account for Claimant's daytime somnolence in assessing his RFC depends on our analysis of whether the ALJ properly assessed Claimant's credibility. The two are inextricably linked. SSR 96-7p. As discussed below, if the ALJ fully credited Claimant's testimony about his daytime somnolence, she did not build a logical bridge from that conclusion to her determination that he is capable of engaging in SGA. Conversely, if the ALJ did not fully credit Claimant's testimony about his daytime somnolence, she did not adequately explain how or why she discounted Claimant's testimony about that subject to come to her conclusion that Claimant has the residual functional capacity to perform sustained light work activity on a regular and continuous basis during a normal work week.

The ALJ is in the best position to determine the credibility of a witness, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barhart*, 442 F.3d 536, 538 (7th Cir. 2006)). Indeed, if the ALJ has adequately explained her decision, the Court will not overturn a credibility determination unless it is "patently wrong." *Skarbek*, 390 F.3d at 504. The ALJ has the discretion to discount testimony on the basis of evidence in the record. *Johnson v. Barhart*, 449 F.3d 431, 435-56 (7th Cir. 2000). But an ALJ must explain her credibility determinations in a way that allows the Court to determine whether she made those determinations rationally and in a logical manner based on specific findings and the evidence in the record. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004)). The ALJ's articulated reasons for the credibility determination must be "sufficiently specific" so that the Claimant and subsequent reviewers understand the weight given to an individual's statements and the reasons for that weight. SSR. 96-7p.

Here, the ALJ did not make a clear determination of Claimant's credibility concerning the ostensive limiting effect of his daytime somnolence. Instead, the ALJ relied upon boilerplate phrasing, discrediting some of Claimant's testimony to the extent it was inconsistent with her residual functional capacity assessment. R.15. The ALJ wrote, "[T]he [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." R.15. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (criticizing virtually identical language as "meaningless" and "yield[ing] no clue to what weight the trier of fact gave the testimony").

At the hearing, Claimant's testimony centered on his daytime somnolence. Yet the ALJ did not squarely address in her opinion the limiting effects of that condition as explained by Claimant or referenced by his treating physicians or the medical expert who testified at the hearing. The ALJ did note that Claimant has "consistently complained of daytime somnolence" but found that he "is able to engage in sustained gainful activity despite his allegations of daytime somnolence." R.17. As support for that conclusion, the ALJ appears to have relied on the fact that Claimant sometimes does chores around the house, has friends and goes to church once a month. R.17. Clearly, though, the ability to do some chores, socialize occasionally and attend church once a month does not evidence the ability of Claimant to engage in "substantial work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ failed to explain what weight she gave to Claimant's testimony concerning his daytime somnolence caused by his sleep apnea and *why* she discredited some or all of that testimony if she did in fact disbelieve it. The ALJ stated that she "considered all factors listed in SSR 96-7p," and seemingly disbelieved Claimant's testimony regarding his need to nap for most of the day. R.16. Claimant testified that he tries to help around the house, but mostly sleeps and naps three or four times daily. R.32. The ALJ concluded, however, that "while the claimant is fatigued some days, other days he is able to do chores." R.16-17.[4] This either amounts to an implicit adverse credibility determination or the ALJ did not understand Claimant's testimony. In either event, it is

---

[4] In describing his daily routine, Claimant said, "Some days I do have it in me to do a little bit [of chores around the house] but I've got to keep sitting, sitting back, sitting around and resting up." R.36. The ALJ did not explain the discrepancy between Claimant's testimony that he must rest during any attempt at chores and her conclusion that Claimant is only fatigued "some days." R.16.

not supported by substantial evidence without more explanation by the ALJ.  If the ALJ did not believe Claimant sleeps most of each day, she did not say that was her conclusion or why she concluded Claimant was not telling the truth about his daily activities and his daytime somnolence.

Alternatively, the ALJ's opinion can be read to credit Claimant's testimony, but not to find that his sleeping most of the day precludes him from engaging in substantial gainful activity.  If the ALJ *did* credit Claimant's testimony and found that he can engage in substantial gainful activity notwithstanding the fact that he sleeps for the majority of each day, then the ALJ needed to explain how and why she came to that conclusion. That is particularly true since there is evidence in the record that undercuts such a conclusion.  When Claimant's attorney questioned the VE about whether light or sedentary work would afford Claimant the opportunity to get "real sleep" during the work day, the VE testified that neither type of work would afford Claimant that opportunity. R.66.  In light of the VE's testimony, if the ALJ credited Claimant's testimony that he sleeps most of each day, then the ALJ must have engaged in some analysis to reconcile the VE's answer with Claimant's testimony.  Any such analysis by the ALJ, however, is absent from the ALJ's written opinion.

Overall, the ALJ's opinion lacks step-by-step reasoning regarding Claimant's credibility that leads to a firm conclusion as to how she factored Claimant's daytime somnolence into her RFC determination and analysis.  The ALJ's opinion leaves us with the following dilemma:  If the ALJ disbelieved Claimant's testimony about the limiting effects secondary to his sleep apnea, on what specific evidence did she ground that determination?  Alternatively, if the ALJ credited Claimant's testimony regarding his

sleep apnea and his need to sleep during the day (e.g., "The Claimant reported he rests 3 to 4 times a day. The Claimant tries to do what he can around the house, but he is usually sleeping. (R.15)), how did she reconcile that with the VE's testimony that someone who needs "real sleep" and takes frequent naps during the day cannot work (R. 66) in reaching her conclusion that Claimant is capable of engaging in substantial gainful activity "despite his allegations of daytime somnolence?"[5]

These fundamental questions make it impossible for this Court to affirm the ALJ's decision on the present record. A reviewing court is obligated to uphold an ALJ's credibility determination where the ALJ provides specific reasons for the determination based on substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ in this case did not make an explicit finding, nor did the ALJ provide specific reasons, for her credibility determination with regard to Claimant. This failure alone provides sufficient reasons for reversal and remand in this case.

It is hard to escape the conclusion that the ALJ's view of Claimant's RFC is based on a smuggled disbelief of Claimant's testimony that he sleeps most of the day. But the ALJ does not say that. Instead, she concludes, "[t]hus, I find that the Claimant is able to engage in sustained gainful activity despite his allegations of daytime somnolence." R. 17. The implicit assumption underlying this seeming non-sequitor is that Claimant can engage in sustained work activity despite the fact that he sleeps most of every day. The logical bridge necessary to support either reading of the ALJ's opinion is absent. If the bridge is meant to be grounded on footings that call into question Claimant's testimony about his daytime somnolence, what substantial evidence makes up those footings?

---

[5] See also the ME McKenna's testimony that the "key issue" with sleep apnea is that "you wake up exhausted in the morning . . . and you're not really fit for the fight." R. 59

Accordingly, we remand so the ALJ can better connect the dots or more fully develop the record on the crucial issue of how Claimant's daytime somnolence impacts the ALJ's RFC analysis.

### B. The ALJ Failed To Fully Develop The Record With Respect To The Claimant's Mental Status As It Relates To His Daytime Somnolence

The ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). An ALJ's failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence. *Smith*, 231 F.3d at 437. Here, the ALJ failed to fulfill this obligation by not exploring the "disconnect" between Claimant's apparent compliance with his medical treatment plan and his alleged symptoms.

An ALJ's "adequate discussion" of the issues does not need to include "a complete written evaluation of every piece of evidence." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). However, in this instance the ME illuminated a possibility that demanded more inquiry than the ALJ gave it. The ME testified several times about a "disconnect" between Claimant's compliance with treatment and his reported sleep condition. *See* R.48; R.49; R.50; R.52. For example, the ME stated, "I really can't understand why, based on the medical evidence that we have, why he's doing so poorly. So there's kind of a disconnect. I really don't understand . . . the case, it doesn't gel. Now if he had some mental impairments, depression, or something like that, that would fill the gap." R.49-50. Shortly thereafter, the ME testified, "Uncontrolled sleep apnea could engender secondary depression. But . . . this isn't my field I just have to introduce it as a possibility." R.51.

Despite the ME's multiple comments about this unexplained "disconnect" in Claimant's situation, the ME's suggestion that a mental impairment could clarify that disconnect, and the ME's admission that mental health is not his field of expertise, the ALJ determined that "a second psychological consultative evaluation is not necessary in this case." R.17. The ALJ focused on the fact that "[C]laimant has received little treatment for depression, and he performed tasks well on examination." R.17. Lack of treatment does not necessarily indicate lack of impairment, however, and it does not shed light on the possible relationship between Claimant's depression and his physical symptoms.

The ALJ's conclusion is especially surprising in light of the fact that Dr. Radomska, a consultative examiner who performed Claimant's psychiatric evaluation for the Bureau of Disability Determination Services, asserted that Claimant is not capable of handling funds in his own interest if benefits are granted. R.462. The same psychiatric evaluation reported Claimant's GAF score to be 45, which indicates severe symptoms. R.462. Dr. Radomska concluded that Claimant suffers from "major depressive disorder, moderate to severe" and suggested that his sleep apnea might complicate his mood symptom. R.462. The ALJ noted Claimant's low GAF score and its implications, but she did not find evidence that Claimant had experienced serious symptoms for the requisite twelve-month durational period necessary to move Claimant's depression to a severe impairment. R.13.

Overall, the ALJ gave "great weight" to the opinion of the other State agency medical consultant, Dr. Schneider, that Claimant had a non-severe affective disorder because it was "consistent with the evidence of record." R.13, 481. But part of the

evidence of record was Dr. Radomska's opinion. Other than by stating conclusorily that Dr. Schneider's opinion was "consistent with the evidence of record," the ALJ did not reconcile the discrepancy between the two opinions, or state why she preferred one over the other.

This conclusion also requires more explanation. The ME opened a question about Claimant's mental functioning and its effect on his physical symptoms, and vice versa. R. 49-51. Two State consultative examiners disagreed about the severity of Claimant's mental impairment. The ALJ had a duty to develop the record more fully with respect to Claimant's mental impairment and its relationship to his daytime somnolence and ultimate ability to engage in SGA. *Smith v. Apfel*, 231 F.3d at 437. Accordingly, this, too, is a subject that the ALJ should explore upon remand.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant Derrick Herring's motion for summary reversal [Dkt. #15] is granted, and the Commissioner's motion [Dkt. #17] is denied. The decision of the Commissioner of Social Security is reversed, and this matter is remanded to the Social Security Administration for further proceedings consistent with the Court's Memorandum Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: December 27, 2012